IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | | |
|---|---|---|
| HELEN LUGENE COOK,<br>    Plaintiff | )<br>)<br>) | |
| v. | )<br>) | Civil Action No. 1:15cv00038 |
| CAROLYN W. COLVIN,<br>  Acting Commissioner of<br>  Social Security,<br>    Defendant | )<br>)<br>)<br>)<br>)<br>) | **MEMORANDUM OPINION**<br><br>BY: PAMELA MEADE SARGENT<br>United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Helen Lugene Cook, ("Cook"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer based on consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Cook has requested oral argument in this matter.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a

-1-

particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "'substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Cook filed an application for DIB on March 21, 2012, alleging disability as of September 1, 2006, due to arthritis; chronic back pain; chronic tendonitis; insomnia; anxiety; depression; and paranoia. (Record, ("R."), at 183-84, 200, 226.) The claim was denied initially and on reconsideration. (R. at 90-92, 96-98, 101, 103-04, 107-08.) Cook then requested a hearing before an administrative law judge, ("ALJ"). (R. at 111.) A video hearing was held on November 20, 2013, at which Cook was represented by counsel. (R. at 34-58.)

By decision dated January 28, 2014, the ALJ denied Cook's claim. (R. at 21-29.) The ALJ found that Cook met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2011. (R. at 23.) The ALJ also found that Cook had not engaged in substantial gainful activity since September 1, 2006, her alleged onset date.[1] (R. at 23.) The ALJ found that, through the date last insured, the medical evidence established that Cook suffered from severe impairments, namely carpal tunnel syndrome; ulnar nerve disorder; mild degenerative disc disease of the lumbar spine; myalgias; and hypertension, but he

---

[1] Therefore, Cook must show that she became disabled between September 1, 2006, the alleged onset date, and December 31, 2011, the date last insured, in order to be entitled to DIB benefits.

found that Cook did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 23-24.) The ALJ found that, through the date last insured, Cook had the residual functional capacity to perform light work[2] that did not require more than occasional reaching, handling and fingering. (R. at 24.) The ALJ found that Cook was unable to perform any of her past relevant work. (R. at 27.) Based on Cook's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Cook could perform, including jobs as a counter rental clerk and an usher. (R. at 27-28.) Thus, the ALJ found that Cook was not under a disability as defined by the Act and was not eligible for DIB benefits. (R. at 28-29.) *See* 20 C.F.R. § 404.1520(g) (2015).

After the ALJ issued his decision, Cook pursued her administrative appeals, (R. at 16), but the Appeals Council denied her request for review. (R. at 1-5.) Cook then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2015). The case is before this court on the Commissioner's motion for summary judgment filed February 25, 2016.[3]

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2015).

[3] Cook did not file a motion for summary judgment, but did file a brief pursuant to court order. (Docket Item No. 11.)

## II. Facts

Cook was born in 1960, (R. at 37, 183), which, at the time of the ALJ's decision, classified her as a "person closely approaching advanced age" under 20 C.F.R. § 404.1563(d). Cook has a high school education and past work experience as a cook, a cook helper and a pizza delivery person. (R. at 39-40, 201.) Cook testified that her medications helped to relieve her symptoms "quite a bit," but that they caused drowsiness. (R. at 51.)

Vocational expert, John Newman, also testified at Cook's hearing. (R. at 40, 54-57.) Newman was asked to consider a hypothetical individual of Cook's age, education and work experience, who would be limited to light work that did not require more than occasional handling or fingering. (R. at 54-55.) Newman stated that such an individual could not perform Cook's past job of pizza delivery because of the limitation to occasional handling and fingering. (R. at 55.) Newman stated that the individual could perform other jobs existing in significant numbers in the national economy, including those of counter and rental clerks and ushers or lobby attendants/ticket takers. (R. at 55.) Newman was asked to consider the same individual, but who would be limited to sedentary[4] work that did not require more than occasional handling and fingering. (R. at 55-56.) He stated that there would be no jobs available that such an individual could perform. (R. at 56.) Newman stated

---

[4] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2015).

-4-

that, if the individual was limited as indicated by Dr. Craven's assessment, there would be no jobs available that such an individual could perform. (R. at 57.)

In rendering his decision, the ALJ reviewed medical records from Dr. Michael Hartman, M.D., a state agency physician; Dr. Jagjit Sandhu, M.D., a state agency physician; April L. Strobel-Nuss, Psy.D., a state agency psychologist; Blue Ridge Family Chiropractic; Dr. Melvin L. Heiman, M.D.; Dr. John M. Chandler, M.D.; Johnston Memorial Hospital; Holston Family Health; Pioneer Medical Center of King; Stone Mountain Health Services; University of Virginia Health System; and Mountainview Medical Center. Cook's attorney also submitted a Medical Source Statement from Dr. Bickley Craven, M.D., to the Appeals Council.[5]

The record shows that Cook was treated at Stone Mountain Health Services, ("Stone Mountain"), from April 2003 through August 2012 for complaints of back pain; urinary tract infections; abdominal pain/strain; tendonitis of the right arm, elbow and thumb; mild chronic obstructive pulmonary disease, ("COPD"); restless leg syndrome; insomnia; headaches; left shoulder pain; and hypertension. (R. at 492-736.)[6] In June and August 2003, Cook complained of back pain after chasing

---

[5] Since the Appeals Council considered and incorporated this additional evidence into the record in reaching its decision, (R. at 1-5), this court also must take these new findings into account when determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991).

[6] Although there are numerous medical reports contained in the administrative record from Stone Mountain, the court cannot determine who the treating health provider was on many of these. It does appear, however, that the provider's signature on some of these reports resembles Dr. Craven's signature on her November 2013 assessments.

-5-

her dog and painting her kitchen. (R. at 617-18.) Dr. Bickley Craven, M.D., diagnosed lateral epicondylitis, recurrent back pain and hypertension. (R. at 617.) In January 2004, Cook complained of right arm tendonitis. (R. at 615.) She reported that Percocet was not helping and requested Roxicet. (R. at 615.) It was noted that Cook exhibited drug seeking behavior. (R. at 614.) A review of the chart showed that Cook had complained of arm pain one time in August 2003. (R. at 615.) Physical examination was normal. (R. at 614-15.) In August 2006, Cook suffered a back sprain following a motor vehicle accident. (R. at 588.) She reported that her migraine headaches had improved. (R. at 588.) Dr. Craven diagnosed piriformis muscle spasms. (R. at 588.) In February 2007, Cook saw Dr. Craven for follow up of a fractured finger. (R. at 581.) She reported that her back and hand pain was relieved with medication. (R. at 581.) On April 3, 2007, Cook reported that she had experienced back pain "on and off" since 2003, after attempting to roll a log into a fire. (R. at 576.) Dr. Craven diagnosed improved piriformis muscle spasm; chronic low back pain; upper body muscle spasm; fracture to fourth finger; and mild COPD. (R. at 578.) On April 14, 2007, a spirometry test was performed, which showed only mild obstruction. (R. at 729-31.) In November 2007, Dr. Craven noted that Cook's hypertension was stable while off of medication. (R. at 570.)

On January 16, 2008, Cook complained of lower mid-abdominal pain and back pain after pulling on a hot tub cover. (R. at 569.) On June 26, 2008, Cook complained of left-sided rib pain after her step-daughter was pulling her arms in an attempt to carry her on her back. (R. at 563.) In July 2008, Cook continued to complain of left rib cage tenderness. (R. at 560.) Dr. Craven diagnosed strained

intercostal muscle, recurrent back pain and hypertension. (R. at 558.) On September 30, 2008, Cook complained of anxiety and depression resulting from raising her boyfriend's teenagers. (R. at 557.) On December 2, 2008, Cook reported that she was taking care of and boarding dogs. (R. at 554.) On April 15, 2009, Cook stated that she had been driving a lot and, as a result, she had arm and hand pain. (R. at 551.) She also complained of feet and right hip pain after walking her dogs and working outside. (R. at 551.) Dr. Craven noted that Cook's anxiety was stable, and her hypertension was controlled. (R. at 549.) On July 29, 2009, Cook reported anxiety related to raising step-children. (R. at 548.) On October 28, 2009, Cook complained of abdominal pain after cleaning for more than one hour. (R. at 545.) She also continued to complain of anxiety related to her step-children. (R. at 545.) On March 10, 2010, Cook complained of chronic back pain after doing "outside jobs at home" and housework. (R. at 542.) On July 20, 2010, Cook reported increased stress related to her boyfriend's children. (R. at 539.) On October 19, 2010, Cook reported that the muscle spasms in her arms and legs were better with medication and that her chronic back pain was stable with medication. (R. at 534.)

On January 26, 2011, Cook complained of increased pain in her right elbow after "cracking a lot [of] black walnuts." (R. at 528.) On April 19, 2011, Cook complained of increased stress following the breakup with her boyfriend. (R. at 522.) She stated that her back pain was better since her Lortab prescription had been increased. (R. at 522.) Cook also reported pain in her arms and elbows with physical exertion. (R. at 522.) Dr. Craven noted that Cook's depression and anxiety symptoms were stable. (R. at 520.) On April 27, 2011, a transvaginal ultrasound

showed a small subserosal fibroid and a small myometrial cyst. (R. at 529.) On May 31, 2011, Cook complained of chronic back pain after a lawn chair fell with her in it. (R. at 519.) On September 28, 2011, Cook reported that she was in the process of moving. (R. at 513.) She complained of increased tendonitis since running out of Klonopin. (R. at 513.) On November 29, 2011, Cook complained of increased pain in her hands and arms, as well as muscle spasms in her right forearm and neck. (R. at 510.) She stated that Lortab and Klonopin helped relieve her symptoms. (R. at 510.) On February 29, 2012, Cook complained of increased back pain after pushing a hot tub lid up against a window. (R. at 507.) She reported that her symptoms of depression and anxiety had improved. (R. at 507.) On May 30, 2012, Cook complained of low back and shoulder pain after moving household items to her new residence. (R. at 504.) On August 21, 2012, Cook complained of right elbow pain and back pain after pulling a golf cart off of a cliff. (R. at 493-95.) She also complained of increased depression and anxiety due to a relationship breakup and her dog being diagnosed with cancer. (R. at 495.) Dr. Craven assessed increased depression and anxiety; right ulnar pain; back pain; hypertension; and recurrent forearm tendonitis. (R. at 493.)

On November 15, 2013, Dr. Craven completed a Clinical Assessment of Pain, indicating that Cook's pain was present and found to be incapacitating; that physical activity greatly increased her pain, causing abandonment of tasks related to daily activities or work; and that Cook was restricted from the workplace as she was unable to function at a productive level. (R. at 798.)

On November 18, 2013, Dr. Craven completed a physical assessment,

indicating that Cook could rarely lift and carry items weighing up to 10 pounds and never lift or carry items weighing more than 10 pounds. (R. at 799-803.) She opined that Cook could only rarely operate foot controls and never climb, balance, stoop, kneel, crouch or crawl. (R. at 801.) Dr. Craven opined that Cook could occasionally operate a motor vehicle and work around quiet to moderate noise; rarely work around dusts, odors, fumes and pulmonary irritants and vibrations; and never work around unprotected heights, moving mechanical parts, humidity and wetness, extreme cold or heat and loud to very loud noises. (R. at 802.) Dr. Craven opined that these limitations had lasted or would last for 12 consecutive months. (R. at 803.) She stated that Cook would be expected to be absent from work 15 out of 20 workdays monthly. (R. at 803.) On May 22, 2014, Dr. Craven stated that she had been Cook's primary care physician since approximately 2002. (R. at 805.) She stated that Cook had been seen regularly for pain due to "tendonitis, arthritis, etc." (R. at 805.)

The record shows that Cook was treated at University of Virginia Health System in July and August 2004 for numbness in her right hand with pain and paresthesias in the right thumb and wrist, which extended into the forearm. (R. at 754-70.) On July 28, 2004, x-rays of Cook's cervical spine showed a slight anterior listhesis at the C3-C4 and C4-C5 disc spaces. (R. at 770.) On August 18, 2004, a nerve conduction study showed right median neuropathy in the forearm with the most common cause being noted as pronator teres syndrome; no significant electrodiagnostic evidence of carpal tunnel syndrome, radial neuropathy or cervical neuropathy; and borderline bilateral ulnar nerve slowing across the elbow with no significant side-to-side difference. (R. at 760.) An electromyography, ("EMG"),

showed that all muscles tested were normal. (R. at 760.) X-rays of Cook's right elbow and forearm were normal, and her right wrist showed mild osteopenia and mild ulnar minus variance. (R. at 754.) X-rays of Cook's cervical spine showed minimal uncovertebral joint degeneration bilaterally at the C3-C4 and C4-C5 disc spaces and no foraminal encroachment. (R. at 757.)

The record shows that Dr. Melvin L. Heiman, M.D., treated Cook from December 2005 through April 2006. (R. at 290-94.) On December 20, 2005, examination revealed mild residual carpal tunnel symptoms and arthritic complaints. (R. at 293-94.) On January 20, 2006, Cook continued to have significant right arm symptoms, but she stated that a counterforce brace provided improvement. (R. at 292.) Nerve conduction studies showed possible pronator syndrome, normal ulnar nerve and normal radial nerve. (R. at 292.) X-rays of Cook's cervical spine were normal. (R. at 292.) Examination revealed tenderness in the dorsal extensor mass; negative extensor stress test; good range of motion of the elbow; and no pain on stress of the trapeziometacarpal joint. (R. at 292.) On March 13, 2006, Cook reported that she was doing extremely well and that her right hand symptoms had resolved,[7] but she reported developing very similar symptoms in her left hand and wrist. (R. at 291.) She had full range of motion of her right hand and wrist. (R. at 291.) On April 25, 2006, Cook complained of significant problems with her left arm and recurring symptoms in her right hand. (R. at 290.) Dr. Heiman referred her to Dr. John Chandler, M.D., a hand surgeon. (R. at 290.)

---

[7] Cook participated in therapy at Johnston Memorial Hospital Occupational Therapy department from January 2006 through August 2007, (R. at 330-410), where she continued to report improvement of her symptoms. (R. at 335, 356, 358, 374, 382, 410, 479.)

On August 8, 2006, Cook presented to the emergency room at Johnston Memorial Hospital, ("Johnston Memorial"), for complaints of lower back pain following a motor vehicle accident the previous week. (R. at 420-26.) X-rays of Cook's lumbar spine were normal. (R. at 423.) She was diagnosed with acute lumbar myofascial strain. (R. at 422.) On November 24, 2006, Cook presented to the emergency room at Johnston Memorial for complaints of an injury to her left ring finger after she tried to separate two dogs while fighting. (R. at 413-19.) X-rays of Cook's left ring finger showed displaced comminuted fractures through the mid and distal aspect of the fourth proximal phalanx. (R. at 416.)

On November 1, 2006, Cook underwent an independent medical evaluation at Blue Ridge Family Chiropractic. (R. at 262-72.) Cook reported severe, constant and chronic neck, mid-back and low back pain; bilateral hip pain; arm pain and weakness; bilateral hand and arm numbness and tingling; weakness of her grip in both hands; migraine headaches; chronic fatigue; insomnia; and fibromyalgia. (R. at 262.) Cook reported a history of several motor vehicle accidents resulting in injuries that most likely contributed to her then-current condition. (R. at 263.) Dr. Dan Levesque, D.C., a chiropractor, diagnosed Cook with vertebral subluxations of L5, T12, T5 and C7 with resulting cervicalgia, thoracalgia and lumbalgia; herniated discs at these spinal levels resulting in cervical and lumbar neuritis/radiculitis; osteoarthritis of the spine; degenerative disc disease; carpal tunnel syndrome; headaches; chronic fatigue; insomnia; and fibromyalgia. (R. at 270.) Cook's prognosis was deemed poor. (R. at 270.) Dr. Levesque noted that Cook had permanent and progressively accelerating disc damage in her spine; neuritis/radiculitis complicated by degenerative disc damage at these levels,

leading to problems of weakness and more neuritis; and advanced disc degeneration which had permanently changed the mechanics of Cook's spine. (R. at 270-71.) Dr. Levesque noted that Cook could not stand or walk for more than 15 minutes at a time; she could not sit for more than 30 minutes at a time; she was limited from performing any fine motor skills; and her grip strength limited her from activities such as grasping, pinching, holding or carrying anything that weighed more than five to 10 pounds. (R. at 271.) It was noted that Cook had not responded to treatment; that there was very little that could be done for her; and she was disabled. (R. at 271.)

On June 5, 2007, Dr. John M. Chandler, M.D., an orthopaedist, saw Cook for evaluation of her left hand following an injury on November 24, 2006. (R. at 297-98.) X-rays of Cook's left ring and long fingers showed well-healed fractures; some narrowing of the proximal interphalangeal, ("PIP"), joint, particularly in the ring finger, but the joint space was well maintained; and good alignment of the condyles. (R. at 297.) He recommended serial casting. (R. at 298.) On August 21, 2007, Dr. Chandler noted that Cook's range of motion in the left ring PIP joint was improving with therapy. (R. at 296.)

On August 14, 2012, Dr. Michael Hartman, M.D., a state agency physician, reported that the evidence provided to the agency was not sufficient to determine whether Cook was disabled prior to December 31, 2011, the date last insured. (R. at 65-66.)

On October 17, 2012, Cook presented to the emergency room at Pioneer

-12-

Medical Center of King for complaints of an injury to her right knee and right shoulder after falling while walking her dogs. (R. at 747-53.) She was diagnosed with abrasions to the hands and right knee and contusions to the left knee and right chest wall. (R. at 749.) On January 1, 2013, Cook presented to the same emergency room for complaints of pain in her right side after falling down five to six steps. (R. at 737-46.) X-rays of Cook's chest and right ribs were normal. (R. at 745.) She was diagnosed with a contusion and a urinary tract infection. (R. at 739.)

On October 22, 2012, Cook was seen at Mountainview Medical Center for new patient establishment. (R. at 790-92.) She reported that she recently moved to the area after her brother came with eight other people and extricated her from a relationship that had gone on for a year and a half where the man basically held her as "a prisoner." (R. at 790.) Cook reported that prior to that, she had an abusive husband and sustained a patellar fracture during that time. (R. at 790.) Cook complained of persistent right knee pain since her dogs ran after a squirrel and pulled her along with them on the asphalt. (R. at 790.) Examination of Cook's right knee showed the anterior and posterior drawers were intact; McMurray's was negative; she had pain on palpation; no ligamentous laxity; some crepitus with extension; and no effusion, edema or erythema. (R. at 790.) X-rays of Cook's right knee were normal. (R. at 790, 797.) She was diagnosed with right knee pain; contusion; chronic back pain; and insomnia. (R. at 791.)

On November 21, 2012, examination revealed that Cook was diffusely tender to palpation at all 18 trigger points for fibromyalgia. (R. at 785.) She had good range of motion of all joints and residual pain after the muscles were

-13-

palpated. (R. at 785.) Her speech was reported as pressured. (R. at 785.) X-rays of Cook's thoracic and lumbar spines showed only mild degenerative change and kyphosis. (R. at 785.) Cook was diagnosed with back pain and myalgias, possibly fibromyalgia and mood disorder. (R. at 785.)

On December 14, 2012, it was noted that Cook's previous urine drug screen was positive for marijuana and her prescribed hydrocodone. (R. at 780-81.) She complained of right knee pain after she fell out of a camper earlier in the week after missing a step. (R. at 781.) Cook stated that she might have to return to work because she was not making any progress with her disability claim. (R. at 781.) Cook's speech was pressured along with tangential thoughts. (R. at 781.) It was noted that, throughout the conversation, it was extremely difficult to redirect her. (R. at 781.) It was noted that the words "pain" and "swelling" were written in ink on her knee to indicate where she had pain and swelling. (R. at 781.) Examination of Cook's right knee showed the anterior and posterior drawers were intact; McMurray's was negative; and she had a "little bit" of swelling along the medial joint line. (R. at 781.)

On January 11, 2013, Cook's mood was stable. (R. at 777.) She was able to cross her legs and walk without difficulty. (R. at 777.) She reported using Biofreeze on her right knee, which provided relief. (R. at 777.) Cook reported that she was doing much better and was very pleased with her progress. (R. at 777.) On March 11, 2013, Cook complained of persistent right knee pain resulting from a fall. (R. at 771.) She reported that she used an Ace bandage, which gave her some relief. (R. at 771.) Examination of the right knee showed circles drawn on it with

-14-

the word "pain." (R. at 772.) She was described as a pleasant lady who was extremely talkative and difficult to follow, but no overt agitation was noted. (R. at 772.) It was noted that Cook was extremely anxious. (R. at 772.) An injection to the knee was offered, but Cook declined. (R. at 771.) She was diagnosed with right knee pain; high-risk medication use; mood disorder; lipoma of the abdominal wall; and hot flashes. (R. at 772.)

On January 8, 2013, April L. Strobel-Nuss, Psy.D., a state agency psychologist, reported that there was not enough evidence to fully evaluate Cook's level of functioning prior to December 31, 2011, the date last insured. (R. at 84.)

On January 9, 2013, Dr. Jagjit Sandhu, M.D., a state agency physician, reported that there was not enough evidence to fully evaluate Cook's level of functioning prior to December 31, 2011, the date last insured. (R. at 83.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2015); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review

does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2015).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Cook argues that the ALJ erred by relying on material mistakes of fact. (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 3-7.) In particular, Cook argues that the ALJ erroneously found that she did not begin treating with Dr. Craven until after her date last insured. (Plaintiff's Brief at 3-7.) Cook further argues that the ALJ erred in his weighing of the medical evidence. (Plaintiff's Brief at 7-9.) Specifically, Cook argues that the ALJ erred by assigning significant weight to the opinions of the nonexamining state agency physicians while giving little weight to the opinions of her treating physician. (Plaintiff's Brief at 7-9.)

It is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975).

-16-

Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(c), if he sufficiently explains his rationale and if the record supports his findings.

In reaching his conclusions regarding Cook's impairments and their effect on her work-related abilities, the ALJ stated:

> … Little weight is given to the opinion of the claimant's treating PCP [primary care physician], Dr. Craven. Dr. Craven completed a medical source statement of the claimant's ability to perform work-related physical activities in November 2013, well after the DLI [date last insured],…. Dr. Craven did not begin treating the claimant until after the DLI. While the claimant's condition may indeed be worse now than at the DLI, there is nothing to suggest her impairments were work preclusive during the period at issue.

(R. at 27.) Cook, through her counsel, concedes that Dr. Craven completed the assessment at issue in November 2013, well after her date last insured, December 31, 2011. Nonetheless, she asserts that the ALJ should have given Dr. Craven's opinion as to her residual functional capacity more weight because it was based on his treatment prior to her date last insured. To prove that the ALJ incorrectly found that Dr. Craven had not treated Cook prior to her date last insured, Cook references only one laboratory report dated April 21, 2003, which noted that the tests performed were ordered by Dr. Craven, (R. at 635), and a May 22, 2014, letter from Dr. Craven, stating that she had treated Cook since approximately 2002

-17-

Case 1:15-cv-00038-PMS   Document 17   Filed 09/28/16   Page 17 of 19   Pageid#: 900

for issues with pain due to tendonitis and arthritis. (R. at 805.) To the court, it appears that the administrative record contains other records documenting treatment by Dr. Craven. Nonetheless, a review of Dr. Craven's November 15, 2013, assessments shows that they do not state that they are based on Cook's condition prior to her date last insured. (R. at 798-803.) Therefore, I hold that the ALJ was justified in giving Dr. Craven's assessments little weight.

Having found that the ALJ properly discounted Dr. Craven's opinion, does not mean that the court finds that substantial evidence supports the ALJ's finding with regard to Cook's residual functional capacity. The ALJ found that, through the date last insured, Cook was capable of performing light work with only occasional reaching, handling or fingering with the upper extremities. In reaching this finding, the ALJ stated that he was giving significant weight to the opinions of the state agency physicians, Dr. Hartman and Dr. Sandhu. The assessments completed by Dr. Hartman and Dr. Sandhu, however, do not support the ALJ's finding on this issue. Instead, both of these physicians opined that the evidence of record was insufficient to fully evaluate Cook's level of functioning prior to her date last insured.

I further note that the ALJ also erred in providing a hypothetical to the vocational expert that did not include his finding as to Cook's limited reaching ability.

Based on the above reasoning, I find that substantial evidence does not exist in the record to support the ALJ's finding that Cook was not disabled, and I will

-18-

remand her claim to the Commissioner for further development consistent with this Memorandum Opinion. Based on this, I will deny Cook's request for oral argument. An appropriate Order and Judgment will be entered.

ENTERED: September 28, 2016.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE